IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,144

STATE OF KANSAS,
*Appellee*,

v.

DONTAVION QUANCHEZE WRIGHT,
*Appellant*.

SYLLABUS BY THE COURT

1.

Foreseeability may not be used to establish aiding and abetting liability for a specific intent crime; the State must prove the defendant possessed the specific intent required to commit the offense.

2.

When a defendant fails to object to an erroneous jury instruction, the error is subject to clear error review. An instructional error is clearly erroneous only if the reviewing court is firmly convinced the jury would have reached a different verdict had the error not occurred, considering the instructions as a whole and the arguments of counsel.

3.

Reckless involuntary manslaughter under K.S.A. 21-5405(a)(1) is a lesser degree of first-degree premeditated murder and therefore is a lesser included offense, for which a lesser included offense jury instruction is legally appropriate. But this instruction is factually appropriate only when the evidence, viewed in the light most favorable to the defendant, would reasonably support a finding that the killing was unintentional but

1

reckless; such an instruction is improper when the only reasonable inference from the evidence is that the defendant acted intentionally.

4.

Involuntary manslaughter under K.S.A. 21-5405(a)(2) based on the underlying felony of aggravated assault requires proof of the predicate felony distinct from the homicide and thus is not a lesser included offense of first-degree premeditated murder.

5.

When a jury submits a question during deliberations, the district court must respond meaningfully. Appellate review is de novo to determine whether the response misstated the law. If the court provided a legally correct response, the sufficiency and propriety of that response are reviewed for abuse of discretion.

6.

A prosecutor commits error by misstating the law, arguing facts or inferences unsupported by the evidence, commenting on facts not in evidence, or expressing a personal opinion on the defendant's guilt or witness credibility. A prosecutor remains within the wide latitude afforded the State and thus commits no error, however, when drawing and arguing reasonable inferences that are supported by the evidence.

7.

When the sufficiency of the evidence is challenged in a criminal case, the court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. Circumstantial evidence can support a conviction of even the

gravest offense if the evidence allows a factfinder to find the elements beyond a reasonable doubt.

8.

Cumulative trial errors, considered collectively, may require reversal of a defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. Unpreserved instructional errors that are not clearly erroneous may not be aggregated as cumulative error.

Appeal from Geary District Court; RYAN W. ROSAUER, judge. Oral argument held December 17, 2025. Opinion filed January 30, 2026. Affirmed.

*Catherine A. Zigtema*, of Zigtema Law Office LC, of Shawnee, was on the brief for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Kris W. Kobach*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

STANDRIDGE, J.:  This is Dontavion Wright's direct appeal following his convictions for first-degree premeditated murder and second-degree intentional murder. He alleges multiple jury instruction errors, contests the district court's response to a jury question, raises several claims of prosecutorial error, challenges the sufficiency of the evidence, and makes a cumulative error argument.

For the reasons discussed below, we affirm Wright's convictions. Wright has identified one harmless error in a single jury instruction, the district court properly responded to the jury's question, the prosecutor's comments were not erroneous, and the

3

State presented sufficient evidence to support his first-degree premeditated murder conviction. In the absence of errors to accumulate, Wright's cumulative error argument necessarily fails.

FACTUAL BACKGROUND

On May 6, 2020, Aaron Villarreal had a barbeque at his house in Junction City. Throughout the day, various people came and went, including 13-year-old A.F., a friend of Villarreal's who lived nearby. Wright, who was at the house next door, was invited over. He introduced himself as "Jay" and hung around for about an hour before returning to Villarreal's house later that night after dark. At that time, only A.F., Villarreal, and Villarreal's mother, Jessica, were there. At some point, Jessica went to bed and Villarreal left briefly to meet up with his friend, Dylan Spencer. When Villarreal came back to the house with Spencer, A.F. and Wright were sitting on the living room couch and Wright's arm was around A.F.'s waist. Villarreal and Spencer told Wright to stop touching A.F. because she was 13 and he was 18. Wright responded, "Okay," and left the house, leaving a phone charger behind.

Minutes later, Wright knocked at the door, saying he was there to get his charger. Villarreal answered the door to find Wright and another man that A.F. identified as "Nook," who were both armed with guns. Nook stood in the doorway while Wright approached Spencer and said, "What's the problem?" or, "[W]ho got a problem?" As Spencer reached for the gun, Wright shot him multiple times, and Nook also fired his gun. After the shooting began, A.F. ran into the next room. From the corner of the room, A.F. saw Villarreal jump out a window. A.F. then heard footsteps and gunshots coming from behind the house. After the shooting stopped, A.F. went to Jessica's bedroom, where she looked out a window and saw Villarreal on the grass towards the back alley. A.F. and Jessica then went to the living room, where they saw Spencer on the couch.

4

Upon arrival, law enforcement located Villarreal lying on the ground in the alley behind the house and found Spencer inside. Both men were pronounced dead at the scene from multiple gunshot wounds. Spencer's wounds indicated that he was shot at close range, while Villarreal's wounds suggested that he was shot at from a greater distance. Officers discovered numerous shell casings from two different guns inside the house and in the back alley.

A.F. initially provided law enforcement with a basic description of the two shooters but could not remember their names. A.F. later provided a more detailed description of the men and recalled that she knew them as Jay and Nook. She also gave law enforcement a picture of Jay from her phone that she had taken at Villarreal's house and said that they had become friends on Snapchat, but she removed him as a friend after the shooting.

Law enforcement's investigation led them to identify Jay as Wright and Nook as Nathaniel Holmes. Officers executed a search warrant at the house next door to Villarreal's house where Wright had been staying. In a bedroom and basement crawlspace, they discovered a semi-automatic pistol and bloody clothing that matched the known DNA profiles of Wright, Holmes, and Spencer. It was later determined that the pistol was one of the guns that had fired the shell casings at the crime scene. Law enforcement also searched another nearby house where Holmes had been staying and located firearm paraphernalia and ammunition that were consistent with the other type of shell casings found at the crime scene. These shell casings had all been fired from the same weapon, although that weapon was never recovered.

The State charged Wright with two counts of first-degree premeditated murder. The case proceeded to a jury trial, where the State presented the evidence outlined above.

5

The jury found Wright guilty of first-degree premeditated murder for killing Villarreal and the lesser included offense of second-degree intentional murder for killing Spencer. The district court sentenced Wright to lifetime imprisonment without the possibility of parole for 50 years, consecutive to a 155-month term of imprisonment.

Wright directly appealed his convictions to this court. Jurisdiction is proper. See K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 22-3601); K.S.A. 22-3601(b)(3)-(4) (life sentence and off-grid crime cases permitted to be directly taken to Supreme Court); K.S.A. 21-5402(b) (first-degree murder is off-grid person felony).

ANALYSIS

On appeal, Wright argues: (1) the district court erred in instructing the jury on accomplice liability and in failing to issue involuntary manslaughter instructions; (2) the district court erred in responding to a jury question; (3) prosecutorial error occurred during voir dire, opening statement, and closing argument; (4) the evidence was insufficient to support his conviction for first-degree premeditated murder; and (5) the cumulative effect of these errors deprived him of his constitutional right to a fair trial. We address each argument in turn.

I.    *Jury instructions*

Wright argues the district court erred in instructing the jury in two ways. First, he alleges the court's instruction on aiding and abetting was legally deficient. Second, Wright contends the court erred in refusing to issue his requested lesser included offense instructions on involuntary manslaughter.

6

We follow a multi-step framework when addressing instructional error issues. First, we consider whether the issue is reviewable; in other words, whether there is appellate jurisdiction and whether the issue is sufficiently preserved for our review. Second, we decide whether the challenged instruction was legally and factually appropriate. In doing so, we exercise unlimited review of the entire record and view the evidence in the light most favorable to the requesting party. Third, upon a finding of error, we determine whether that error requires reversal or can be considered harmless. *State v. Holley*, 313 Kan. 249, 253-54, 485 P.3d 614 (2021).

Whether a party has preserved the jury instruction issue at the first step affects an appellate court's reversibility inquiry at the third step. *State v. Peters*, 319 Kan. 492, 515-16, 555 P.3d 1134 (2024). When a party fails to object to a jury instruction before the district court, an appellate court reviews the instruction to determine whether it was clearly erroneous. K.S.A. 22-3414(3). To be clearly erroneous, an instruction must be legally or factually inappropriate and the court must be firmly convinced the jury would have reached a different verdict if the erroneous instruction had not been given. The party alleging clear error has the burden to show both error and prejudice. *State v. Mendez*, 319 Kan. 718, 727-28, 559 P.3d 792 (2024).

A.    *Aiding and abetting instruction*

The district court instructed the jury on the elements of the substantive offenses: first-degree premeditated murder and the lesser included offenses of second-degree intentional murder and voluntary manslaughter. The court also issued an aiding and abetting jury instruction at the State's request, and without objection from Wright. Instruction No. 15 stated:

7

"A person is criminally responsible for a crime committed by another if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime.

"The person who is responsible for a crime committed by another is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the person could reasonably foresee the other crime as a probable consequence of committing or attempting to commit the intended crime.

"All participants in a crime are equally responsible without regard[] to the extent of their participation. However, mere association with another person who actually commits the crime or mere presence in the vicinity of the crime is insufficient to make a person criminally responsible for the crime."

See K.S.A. 21-5210; PIK Crim. 4th 52.140.

At the first step of our framework for jury instruction issues, Wright did not object to the aiding and abetting instruction, so we review the instruction for clear error. See K.S.A. 22-3414(3).

At the second step, we consider whether the aiding and abetting instruction was legally and factually appropriate, using an unlimited standard of review of the entire record. See *Holley*, 313 Kan. at 254. "[A]n instruction must always fairly and accurately state the applicable law, and an instruction that does not do so would be legally infirm." *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012).

Wright argues the aiding and abetting instruction—specifically the portion regarding foreseeability—was legally deficient because it impermissibly relieved the State of the burden to prove premeditation.

8

There is no question that Instruction No. 15 accurately reflected Kansas' aiding and abetting statute. See K.S.A. 21-5210; *State v. Gonzalez*, 311 Kan. 281, 293, 460 P.3d 348 (2020). But the second paragraph of the instruction told the jury that a person is responsible for any other crime committed in carrying out the intended crime if the person could "reasonably foresee the other crime as a probable consequence" of committing the intended crime. The Notes on Use for PIK Crim. 4th 52.140 state that the foreseeability language "should not be used for a specific-intent crime for which defendant is charged on an aiding and abetting theory" and should be used only when considering whether the defendant is guilty of a general intent crime. See, e.g., *Gonzalez*, 311 Kan. at 291 (use of foreseeability instruction must be limited when defendants are charged with aiding and abetting specific intent crimes).

First-degree premeditated murder is a specific intent crime. See *State v. Engelhardt*, 280 Kan. 113, 132, 119 P.3d 1148 (2005) ("The specific intent required to be proved for conviction on a premeditated first-degree murder charge is premeditation. . . . [A] person guilty of aiding and abetting a premeditated first-degree murder must be found, beyond a reasonable doubt, to have had the requisite premeditation to murder the victim."). As a result, Instruction No. 15 did not accurately state the applicable law in Wright's case. See, e.g., *State v. Overstreet*, 288 Kan. 1, 12, 200 P.3d 427 (2009) ("[T]he fact that it may be foreseeable that someone may die as a result of a particular course of action does not give rise to the conclusion that the cause of death was premeditated."); *Engelhardt*, 280 Kan. at 132-33 (foreseeability instruction negated the intent element of premeditated murder and was confusing because defendant was also charged with other crimes of kidnapping, criminal threat, and battery). The State concedes that inclusion of the foreseeability language in the aiding and abetting instruction was legally inappropriate.

9

Given this error, we move to the third step of our analysis to consider whether it was clearly erroneous. To constitute clear error, this court must be firmly convinced the jury would have reached a different verdict without the error. See K.S.A. 22-3414(3); *Mendez*, 319 Kan. at 727.

To that end, Wright contends the jury would have returned a different verdict without the error because the evidence of his premeditation was weak and the physical evidence showed that Holmes killed Villarreal. Quoting *Overstreet*, Wright suggests it is likely that the jury found him criminally liable for Holmes' conduct "because it was 'a reasonably foreseeable consequence of the aggravated assault.'"

But the facts in *Overstreet* are readily distinguishable from those here, and so Wright's reliance on it is misplaced. There, the defendant was charged with attempted first-degree premeditated murder and aggravated assault, both under an aiding and abetting theory. At the close of evidence, the district court issued an aiding and abetting instruction that included the foreseeability provision. 288 Kan. at 8. On appeal, this court found the instruction clearly erroneous, reasoning that there was "a real possibility that the jury, following this [foreseeability] instruction . . . convicted Overstreet of the attempted premeditated murder not because the defendant aided or abetted in the attempted premeditated murder but because the murder was a reasonably foreseeable consequence of the aggravated assault." 288 Kan. at 14-15. Critical to the court's finding of clear error was the prosecutor's comments during closing argument, where the prosecutor focused on the foreseeability factor, stating that attempted murder was a reasonably foreseeable consequence of aggravated assault and arguing that the defendant was guilty of aiding and abetting first-degree murder even if he "'only wanted to aid an aggravated assault.'" 288 Kan. at 14.

10

There is no similar concern in this case that the jury convicted Wright of first-degree premeditated murder because it was a foreseeable consequence of aggravated assault. Wright was not charged with aggravated assault or any other crime besides first-degree premeditated murder. To the extent Wright is arguing the jury could have understood the instruction to mean Wright could reasonably foresee the killing of Villarreal (other crime) as a probable consequence of killing Spencer (intended crime), there is no evidence that Wright and Holmes only intended to kill Spencer or that they only killed Villarreal because they had killed Spencer. See K.S.A. 21-5210; PIK Crim. 4th 52.140 ("The person who is responsible for a crime committed by another is also responsible for any *other crime* committed in carrying out or attempting to carry out the *intended crime*, if the person could reasonably foresee the *other crime* as a probable consequence of committing or attempting to commit the *intended crime*." [Emphases added.]).

In any event, we consider jury instructions as a whole, without focusing on any single instruction in isolation, to determine whether they properly and fairly state the applicable law or if it is reasonable to conclude they could have misled the jury. *State v. Hollins*, 320 Kan. 240, 244, 564 P.3d 778 (2025). The first-degree premeditated murder instructions here told the jury that the State was required to prove that Wright intentionally killed Spencer and Villarreal and that "the killing[s] [were] done with premeditation." The instructions also defined premeditation:

> "'Premeditation' means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

In considering the entirety of the jury instructions, we conclude that the instructions accurately stated Kansas law and did not mislead or confuse the jury. What is

11

more, unlike the prosecutor in *Overstreet*, the prosecutor here did not mention or focus on the erroneous foreseeability language. The prosecutor only briefly referenced the aiding and abetting instruction during the State's rebuttal closing argument by reciting the statutory definition of aiding and abetting in K.S.A. 21-5210(a).

For these reasons, we are not firmly convinced that the jury's verdict would have been different had the foreseeability provision in the aiding and abetting instruction not been given.

### B.    *Involuntary manslaughter instructions*

At the instructions conference, defense counsel requested instructions on involuntary manslaughter as a lesser included offense of first-degree premeditated murder related to Spencer's killing. Counsel asked for an instruction on reckless involuntary manslaughter under K.S.A. 21-5405(a)(1) and an instruction on involuntary manslaughter during the commission of aggravated assault under K.S.A. 21-5405(a)(2), which applies when a killing occurs during the commission of a non-inherently dangerous felony or misdemeanor enacted to protect human life and safety. Finding these instructions were not supported by the evidence or the law, the district court declined counsel's request to instruct the jury on involuntary manslaughter.

Wright challenges the district court's refusal to instruct the jury on both types of involuntary manslaughter.

At the first step of our jury instruction framework, Wright requested the involuntary manslaughter instructions, thereby preserving this issue for appeal. Next, we consider whether the instructions were legally and factually appropriate, exercising unlimited review over the entire record. See *Holley*, 313 Kan. at 254.

12

1.     *Reckless involuntary manslaughter*

As relevant here, involuntary manslaughter is the killing of a human being committed recklessly. K.S.A. 21-5405(a)(1). A person acts "recklessly" when he or she "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 21-5202(j). Reckless conduct is distinguishable from intentional conduct, which requires a conscious objective or desire to engage in the conduct or cause the result. See K.S.A. 21-5202(h).

Reckless involuntary manslaughter under K.S.A. 21-5405(a)(1) is a lesser degree of first-degree premeditated murder and therefore is a lesser included offense, for which a lesser included offense instruction is legally appropriate. See *State v. James*, 309 Kan. 1280, 1298, 443 P.3d 1063 (2019); *State v. Haygood*, 308 Kan. 1387, 1408, 430 P.3d 11 (2018); see also *State v. Gentry*, 310 Kan. 715, 721, 449 P.3d 429 (2019) (generally discussing lesser included offense instructions).

Because the instruction was legally appropriate, we turn to whether it was factually appropriate. The district court must instruct the jury on legally appropriate lesser included offenses where the evidence—viewed in the light most favorable to the defendant or the requesting party—would reasonably justify a conviction of the lesser included offense. *State v. Berkstresser*, 316 Kan. 597, 601, 520 P.3d 718 (2022); see K.S.A. 22-3414(3) ("In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime . . . the judge shall instruct the jury as to the crime charged and any such lesser included crime.").

13

An instruction on reckless homicide may be factually appropriate when there is some evidence that the act that caused the death was intentional, but the killing itself was unintentional (albeit reckless). *State v. McCullough*, 293 Kan. 970, 979, 270 P.3d 1142 (2012). But a reckless homicide instruction is "'not appropriate when the only inference supported by the evidence is that the defendant intended to kill his or her victim.'" *State v. Bobian*, 321 Kan. 169, 180, 574 P.3d 385 (2025) (quoting *State v. Carter*, 305 Kan. 139, 162, 380 P.3d 189 [2016]).

Wright argues an instruction on reckless involuntary manslaughter was factually appropriate because the jury could have reasonably concluded either that Spencer was killed when he reached for the gun and it accidentally discharged during the struggle, or that Wright recklessly brought the gun to the house to scare or threaten the victims.

Reviewing the evidence in the light most favorable to Wright fails to support a finding that Wright's actions were reckless rather than intentional. After leaving the house, Wright returned with a gun and an armed accomplice. Contrary to Wright's theory of an accidental discharge, the record reflects that Wright pointed his gun at Spencer and shot him multiple times. Each time Wright fired a shot, it was an intentional action. Simply put, Wright intended to kill Spencer.

This court has found that instructions on reckless involuntary manslaughter were inappropriate under similar circumstances. See, e.g., *McCullough*, 293 Kan. at 979-80 (evidence showed defendant left convenience store after fistfight with victim, returned with a knife, reached around another person, and stabbed victim); *State v. Calderon*, 270 Kan. 241, 242, 256, 13 P.3d 871 (2000) (evidence showed that when victim approached defendant and threatened to hit him, defendant drew a knife and stabbed victim); *State v. Bailey*, 263 Kan. 685, 691, 952 P.2d 1289 (1998) ("[A] defendant's actions in pointing a gun at someone and pulling the trigger are intentional rather than reckless even if the

14

defendant did not intend to kill the victim."), *overruled on other grounds State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006).

Because an instruction on reckless involuntary manslaughter was factually inappropriate, the district court did not err in refusing to give it.

2.      *Involuntary manslaughter while committing aggravated assault*

Involuntary manslaughter is also defined, in relevant part, as "the killing of a human being committed . . . in the commission of, or attempt to commit, or flight from any felony, other than an inherently dangerous felony as defined in K.S.A. 21-5402, and amendments thereto, that is enacted for the protection of human life or safety." K.S.A. 21-5405(a)(2).

Wright argues an instruction on involuntary manslaughter during the commission of felony aggravated assault would have been legally appropriate as a lesser included offense of first-degree premeditated murder. Yet Wright's argument overlooks the critical statutory distinction between subsections (a)(1) and (a)(2) of the involuntary manslaughter statute and the corresponding structure of K.S.A. 21-5402.

Unlike reckless involuntary manslaughter under K.S.A. 21-5405(a)(1), which differs from first-degree premeditated murder only by the degree of culpable mental state, involuntary manslaughter under subsection (a)(2) is a felony-based homicide offense. By its plain terms, subsection (a)(2) requires proof of an additional, independent element: the commission of a qualifying predicate felony that is separate from the act of killing itself. This structural difference is not incidental—it is foundational to the statutory scheme.

15

The Legislature's treatment of aggravated assault in K.S.A. 21-5402 confirms this distinction. Aggravated assault is not listed among the felonies that are inherently dangerous per se under subsection (c)(1). Instead, it appears only in subsection (c)(2), which applies only when the felony is so distinct from the homicide alleged as to not be an ingredient of the homicide. K.S.A. 21-5402(c)(2)(D). This placement reflects the Legislature's recognition that aggravated assault commonly merges with the act causing death and therefore cannot serve as a predicate felony unless it is legally and factually separate from the killing.

Because involuntary manslaughter under K.S.A. 21-5405(a)(2) requires proof of a predicate felony that is distinct from the homicide, it does not stand in a lesser included relationship to first-degree premeditated murder. Accordingly, an instruction on involuntary manslaughter during the commission of aggravated assault was not legally appropriate, and the district court did not err in declining to give it.

II.    *Jury question*

Next, Wright challenges the district court's response to a jury question, asserting that the court's answer misstated the law on the State's burden of proof and the legal standards for consideration of lesser included offenses. Wright claims this resulted in structural error that warrants automatic reversal of his convictions.

After a jury has retired for deliberation, it may seek more information on a point of law from the district court. K.S.A. 22-3420(d). This court has set forth the following applicable standard of review:

"A trial court may not ignore a jury's request submitted pursuant to K.S.A. 22-3420[d] but must respond in some meaningful manner or seek additional clarification or limitation of the request. It is only when the trial court makes no attempt to provide a meaningful response to an appropriate request or gives an erroneous response that the mandatory requirement of K.S.A. 22-3420[d] is breached. Once the trial court attempts to give an enlightening response to a jury's request or seeks additional clarification or limitation of the request, then any issue as to the sufficiency or propriety of the response is one of abuse of discretion by the trial court." *State v. Boyd*, 257 Kan. 82, Syl. ¶ 2, 891 P.2d 358 (1995).

Under *Boyd*, we apply a two-step analysis to review a district court's response to a jury's question. First, we conduct a de novo review to determine whether the court failed to respond to the jury's question or provided a response to the question that was legally incorrect. Second, if the court did respond and the response did not affirmatively misstate the law, we use an abuse of discretion standard to evaluate the sufficiency or propriety of the response. See *State v. Fraire*, 312 Kan. 786, 794, 481 P.3d 129 (2021). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Younger*, 320 Kan. 98, 137-38, 564 P.3d 744 (2025); see *State v. Boeschling*, 311 Kan. 124, 129, 458 P.3d 234 (2020) ("'[W]hen looking at which legally appropriate response the court should have made, [this court] accord[s] the trial court the deference of looking to whether no reasonable person would have given the response adopted by the trial court.'"). The party asserting that the district court abused its discretion bears the burden of establishing such abuse of discretion. *Peters*, 319 Kan. at 497-98.

During deliberations, the jury submitted the following question to the district court: "Are jurors allowed to research the difference between first-degree and second-degree murder or can judge clarify?" The district court judge gave the following oral response:

"So, before we get to recessing for this evening, which we will do, I wanted to address your question. And the question is, first of all, Are jurors allowed to research the difference between first- and second-degree murder? The bigger issue is that you cannot research anything. The only thing you're allowed to research, if you look at my instructions, I mean, we talk a little bit about that at the beginning. The short is, no, you can't research anything. I'm going to tell you the difference. I'm going to answer your question, okay. But the bigger picture, don't research anything. You can only consider the evidence that's been presented in this case and the law given you.

"*Now, when you look at, at the difference between first- and second-degree murder, compare what—whether the State has the burden to prove for first degree or what the State has to prove beyond a reasonable doubt for second-degree and that's your difference. It's actually no more complicated than that.*" (Emphasis added.)

The judge then asked if counsel agreed with his statement, and the following occurred:

"[The prosecutor]: Yes, Your Honor. The elements would be contained on the jury instructions.

"THE COURT: Defense, do you agree with that?

"[Defense counsel]: I would agree, Your Honor.

"THE COURT: And it's—you do that comparative to contrast, which is exactly why I gave those instructions. There's, there's—but, yeah, take a look and that will be the answer to the question, okay."

Given Wright's failure to object to the district court's response to the jury's question, in addition to his affirmative approval of the court's response, we could conclude that Wright did not preserve this issue for review. See *State v. Green*, 315 Kan. 178, 182, 505 P.3d 377 (2022) (Issues not raised before the district court cannot be raised

18

on appeal.); *Fraire*, 312 Kan. 786, Syl. ¶ 4 ("When trial counsel affirmatively approves of a court's response to a jury's question, an assertion on appeal of error in the response is tantamount to invited error, rendering the issue unreviewable."); *Boyd*, 257 Kan. at 89 (finding defendant waived issue for appeal regarding trial court's responses to jury's requests for further information where defendant failed to voice any objections or suggest a different response).

But even if we reach the merits of Wright's argument, he is not entitled to relief because the district court's response to the jury's question did not misstate the law.

In reviewing the district court's response to a jury question, we focus on whether the answer was a correct statement of the law. *State v. Wade*, 295 Kan. 916, 921-22, 287 P.3d 237 (2012). The jury's question sought clarification between first- and second-degree murder. The district court's answer essentially referred the jury back to the instructions setting forth the elements for first- and second-degree murder. We have approved the response of simply directing the jury's attention back to the instructions. 295 Kan. at 923 (approving "the tack of simply directing the jury's attention back to the instructions").

Yet Wright's argument focuses on the following part of the district court's response:

> "Now, when you look at, at the difference between first- and second-degree murder, compare what—whether the State has the burden to prove for first degree or what the State has to prove beyond a reasonable doubt for second-degree and that's your difference. It's actually no more complicated than that."

Wright contends that this language effectively eliminated the State's burden of proof by telling the jury to decide whether the State had the burden of proof. He also claims it improperly instructed the jury to consider lesser included offenses by comparing them side by side, rather than considering first-degree murder individually and only considering second-degree murder if there was reasonable doubt as to guilt for first-degree murder.

But when this narrow portion of the district court's answer is read in context with the jury's question and the court's entire response, we easily conclude that the court did not misstate the law. The jury asked if it could research the difference between first- and second-degree murder, or if the court could clarify the difference. In response, the court correctly told the jury that it could not conduct any additional research beyond the admitted evidence and the provided law—the jury instructions. To determine the difference between first- and second-degree murder, the court told the jury to compare the elements of the two crimes. Contrary to Wright's assertion, the court's use of the word "whether" did not constitute commentary or instruction on the State's burden of proof. Rather, it appears the judge merely stumbled over his words, and it was no more than an innocent misspeak. Nor did the court direct the jury to consider both offenses simultaneously when considering lesser included offenses. Indeed, the jury's question did not request guidance on this issue. The court simply answered the jury's question by explaining that it should differentiate between first- and second-degree murder by comparing the elements of the two crimes.

Because the district court's answer to the jury's question did not misstate the law, we conclude that the court did not abuse its discretion in responding to the jury.

20

III.    *Prosecutorial error*

Wright argues that several comments made by the prosecutor during voir dire, opening statement, and closing argument misstated the law on premeditation, misstated the evidence to prove premeditation, and offered improper personal opinions on his guilt.

Wright did not object at trial to any of the comments he challenges on appeal, but a contemporaneous objection is not required to preserve a prosecutorial error claim based on a prosecutor's comments made during voir dire, opening statement, or closing argument. An appellate court may, however, factor the presence or absence of an objection into its analysis of the alleged error. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

We apply a two-step framework to evaluate claims of prosecutorial error. We first consider whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. *Mendez*, 319 Kan. at 737.

> "Prosecutors do not violate this wide latitude by highlighting evidence or discussing reasonable inferences drawn from that evidence so long as their arguments remain consistent with the evidence. But prosecutors do exceed the wide latitude by, for example, misstating the law that applies to that evidence, misstating evidence, commenting on witness credibility, or shifting the burden of proof to the defendant. [Citations omitted.]" *State v. Alvarado-Meraz*, 321 Kan. 51, Syl. ¶ 3, 573 P.3d 266 (2025).

In evaluating whether a prosecutor's statement is erroneous, we consider "the context in which the statement was made, rather than analyzing the statement in isolation." *State v. Hillard*, 313 Kan. 830, 843, 491 P.3d 1223 (2021).

Next, if a prosecutorial error occurred, we move to the second step to determine whether the error demands reversal. Because prosecutorial error implicates a defendant's constitutional right to a fair trial, we apply the constitutional harmlessness test stated in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Such error is harmless if the State can demonstrate "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.,* where there is no reasonable possibility that the error contributed to the verdict.'" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). The party benefiting from the error bears the burden of proving harmlessness. *State v. Ward*, 292 Kan. 541, 568-69, 256 P.3d 801 (2011).

A.      *Misstatements of law regarding premeditation*

A prosecutor commits error by misstating the law. *State v. Z.M.*, 319 Kan. 297, 317, 555 P.3d 190 (2024). Wright argues that the prosecutor made several misstatements of law regarding premeditation. He challenges certain portions of the prosecutor's closing argument, but it is important to quote the relevant surrounding argument to consider the statements in context:

> "I want to talk to you a little bit about the instructions that the Court has given you in part. To prove premeditated first-degree murder, the State has to prove that the defendant not only acted intentionally, but also, with premeditation. Now, premeditation is defined as having thought the matter beforehand *or having formed the design or intent to kill*. It does not require a set period of time. I don't have to prove to you days, weeks, months of planning. The State would submit to you that the evidence is, when the defendant left that

22

residence after being confronted and came back, he came back with firearms. What was going to happen? Not only did he come back with a firearm, but he came back with another person who was also armed. And when he went into the living room, where did the other guy stay? In the doorway. Where were people going to go? Look at the photos. This isn't a large area. They're both armed. They both come back and he immediately confronts Dylan. And, within a short period of time, they start firing.

"We're not talking one or two shots going off. We're not talking a quick struggle over here and an accidental discharge. We are talking 25 rounds between two individuals in a matter of minutes, ladies and gentlemen. *That is intentional*. Dylan Spencer had 16 entrance wounds. 16 blows to his body. *That is intentional*. Aaron fled from the house trying to get away when both of the shooters ran after him and he had 6 entrance wounds. Ladies and gentlemen, not one or two, not a struggle here. There's no conversation, except that they chased Aaron around the house and shot him in the back alley. He was hit 6 times. It's not accidental. It's not in the heat of passion. *It is intentional and it is with that thought*. When they're chasing him, they are forming the intent to kill him. There was no intention of Aaron or Dylan living to talk about the events that are going on that morning.

. . . .

"The State submits that it has proven beyond a reasonable doubt that the defendant and Nathaniel Holmes acted intentionally and with premeditation." (Emphases added.)

First, Wright focuses on the statements italicized above to support his argument that the prosecutor misstated the definition of premeditation by equating it with the intent to kill and undercutting the temporal and cognitive components of premeditation.

"[P]remeditation has both a temporal and a cognitive element: a killing is premeditated when the intent 'arises before the act takes place' and is 'accompanied by reflection, some form of cognitive review (i.e., "thinking over")."' *State v. Dotson*, 319

23

Kan. 32, 43, 551 P.3d 1272 (2024) (quoting *State v. Stanley*, 312 Kan. 557, 572, 478 P.3d 324 [2020]).

> "To satisfy the temporal component of premeditation, the State must show that the intent to take another's life and the opportunity for cognitive reflection arose '"before the final act of killing,"' though '"there is no specific time period"' required. As a result, our court has repeatedly cautioned prosecutors against making arguments that 'essentially suggest[]' that premeditation could form instantaneously [because] [s]uch arguments can blur the line between a premeditated killing and an instantaneous, intentional killing. [Citations omitted.]" *Dotson*, 319 Kan. at 44.

See *State v. Marks*, 297 Kan. 131, 139, 298 P.3d 1102 (2013) (prosecutor erred by stating that defendant formed the intent to kill '"during the act [of stabbing] itself"' because it "confused the formation of premeditation from what was instructed").

Wright mischaracterizes the prosecutor's statements. Read in context, the prosecutor did not equate premeditation with intent or otherwise suggest that Wright formed premeditation while he shot at the victims. Consistent with the statute defining first-degree murder and the jury instructions setting forth the elements of the alleged crimes, the prosecutor explained that first-degree murder requires proof of an intentional, premeditated killing and defined premeditation for the jury. See K.S.A. 21-5402(a). Thus, the prosecutor properly described the temporal and cognitive requirements for premeditation and did not minimize or conflate these requirements. The prosecutor then discussed the evidence the State was relying on to support intent and premeditation, including the number of shots Wright and Holmes fired and their chase of Villarreal as he ran away.

The prosecutor's comments were well within the bounds of proper argument. See *State v. Cofield*, 288 Kan. 367, 373-74, 203 P.3d 1261 (2009) (large number of gunshots

24

fired is relevant factor to establish premeditation); *State v. Jamison*, 269 Kan. 564, 572, 7 P.3d 1204 (2000) (pursuit of victim with a gun is evidence of premeditation); see also *State v. Blansett*, 309 Kan. 401, 417, 435 P.3d 1136 (2019) ("Evidence of several stab wounds can be a factor supporting a finding of premeditation. When this court reviews a challenge to the sufficiency of the evidence of premeditation, it considers, among other things, circumstantial evidence of '"the nature of the weapon used"' and '"the dealing of lethal blows after the deceased was felled and rendered helpless."'").

Wright also argues that the prosecutor's comments above do not distinguish between his formation of premeditation and that of Holmes. Instead, Wright claims the prosecutor grouped them together and minimized the requirement that Wright must form his own premeditation or consciously share Holmes' premeditation. This argument is unpersuasive. The prosecutor did not state that Wright need not form his own premeditation or otherwise suggest that his premeditation could be inferred from Holmes' premeditation. The prosecutor merely described the actions Wright and Holmes took that constituted evidence of premeditation, many of which they took together.

Next, Wright suggests that the prosecutor's rhetorical question, "What was going to happen?" was improper because it misstated the law on premeditation and accomplice liability and was the equivalent of telling the jury that premeditation could be proved from reasonable foreseeability. After defining premeditation, the prosecutor said,

> "The State would submit to you that the evidence is, when the defendant left that
> residence after being confronted and came back, he came back with firearms. What was
> going to happen? Not only did he come back with a firearm, but he came back with
> another person who was also armed."

Again, Wright mischaracterizes the prosecutor's comments. The prosecutor did not reference accomplice liability at all or otherwise equate foreseeability with premeditation.

The question, "What was going to happen?" read in context, simply recognized that Wright's actions of returning to the house with a gun and an armed accomplice could constitute evidence of premeditation.

Wright alleges the prosecutor further misstated the law on premeditation and accomplice liability by stating:

> "Jury Instruction 15 talks about, A person is criminally responsible for the crime committed by another person if the person, either before or during the commission and with the mental culpability required to commit the crime, intentionally aids another to commit the crime. And I would submit to you that, based on the evidence and the actions of the defendant and Nathaniel Holmes in this case, that you can and should find the defendant guilty of premeditated murder for the killings of Dylan Spencer and Aaron Villarreal."

Wright asserts the prosecutor's comments wrongly implied that the jury could find premeditation was formed during the act of killing, continued to equate premeditation with intent, blurred the temporal and conscious requirements for premeditation, and failed to address the need for Wright to form premeditation individually, separate and apart from Holmes.

This argument lacks merit. The prosecutor's comments set forth a correct statement of the law defining accomplice liability and correctly explained that to be convicted under an aiding and abetting theory, a person must have the mental culpability required to commit the crime. See K.S.A. 21-5210(a); PIK Crim. 4th 52.140. This comment was proper and did not constitute error.

B.    *Misstatements of the evidence to prove premeditation*

Wright claims the prosecutor committed additional error during the closing argument cited above by misstating the evidence to prove premeditation.

"A prosecutor falls outside the wide latitude afforded the State in conducting its case when he or she . . . argues a fact or factual inference with no evidentiary foundation." *State v. Watson*, 313 Kan. 170, Syl. ¶ 3, 484 P.3d 877 (2021). It is also prosecutorial error to comment on facts not in evidence. *State v. Stimec*, 297 Kan. 126, 128, 298 P.3d 354 (2013). However, "[i]n closing argument, the prosecutor may draw reasonable inferences from the evidence." *State v. Hall*, 292 Kan. 841, Syl. ¶ 3, 257 P.3d 272 (2011); see *State v. Davis*, 306 Kan. 400, 414, 394 P.3d 817 (2017) (Prosecutors enjoy wide latitude in crafting closing arguments, but a prosecutor's arguments must remain consistent with the evidence.).

Wright claims there is no evidentiary support for the prosecutor's statement that both assailants chased Villarreal as he fled from the house. Wright notes that A.F. only testified that she heard footsteps and gunshots; she could not attribute the footsteps to Wright because she did not see Wright chasing Villarreal.

Contrary to Wright's argument, the prosecutor's statement was a reasonable inference based on the evidence. A.F. testified that after Villarreal jumped out the window, she heard footsteps and gunshots behind the house. Villarreal's body was found in the back alley with multiple gunshot wounds. Shell casings from two different guns, including the one linked to Wright, were found at the scene. This evidence supported the prosecutor's argued inference that Wright and Holmes both chased and shot at Villarreal.

27

Wright also contends the prosecutor misstated the evidence by saying, "There was no intention of Aaron or Dylan living to talk about the events that are going on that morning." Wright claims a statement suggesting that there was a plan to kill witnesses is inconsistent with the reality that there was no attempt to kill A.F. or anyone else who had seen "Jay." Wright again mischaracterizes the prosecutor's statement. The prosecutor did not appear to be arguing that Wright and Holmes had planned to eliminate all witnesses; she was simply inferring that once the men started shooting, they were not going to let Spencer or Villarreal get away. Based on the evidence outlined above, the prosecutor's inference was reasonable. See *Hall*, 292 Kan. 841, Syl. ¶ 3 (prosecutors allowed to make reasonable inferences from the evidence).

C.    *Personal opinions on Wright's guilt*

For his final claim of error, Wright claims the prosecutor repeatedly and improperly offered personal opinions on his guilt during voir dire, opening statement, and closing argument. "[A] prosecutor's wide latitude does not extend to announcing the prosecutor's opinion on issues for the jury, including the defendant's guilt or innocence or witness credibility." *State v. Alfaro-Valleda*, 314 Kan. 526, 538, 502 P.3d 66 (2022).

Wright focuses on small parts of the following statements made by the prosecutor throughout trial, but additional relevant commentary is provided for full context as needed.

During voir dire, the prosecutor stated:

> "So, as the county attorney, my job is to prosecute cases that are brought, brought to *my office that I feel that we can prove beyond a reasonable doubt*. The Court talked to you that the State has the burden of proof in a criminal case and that burden of proof is

28

beyond a reasonable doubt. And that is the burden that the State willingly accepts when it files charges and brings cases forward. So, the State understands its burden and intends to prove that through the course of evidence this week." (Emphasis added.)

Rather than an improper personal opinion on Wright's guilt, the prosecutor's comment here simply explained the prosecutor's role in the proceedings and reiterated the State's burden of proving guilt beyond a reasonable doubt. A prosecutor in a criminal case cannot ethically prosecute a charge that the prosecutor knows is unsupported by the evidence. See Kansas Rules of Professional Conduct 3.8(a) (2025 Kan. S. Ct. R. at 393) ("The prosecutor in a criminal case shall . . . refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause.").

During opening statement, the prosecutor said:

"At the conclusion of this case, I will come back and be able to make closing arguments to you and review all of the evidence the State has put on over the course of this week. And, at the conclusion of that, I'm going to ask you to render the verdicts that the evidence supports and what the State believes they will prove beyond a reasonable doubt to you and that is verdicts of guilty to two counts of premeditated first-degree murder. Thank you."

This statement is a commentary on the evidence the State planned to present and is not a personal belief. The prosecutor was merely telling the jury that the State intended to present sufficient evidence to support its request for guilty verdicts on both counts of first-degree premeditated murder and asking the jury to render verdicts supported by the evidence.

During closing argument, the prosecutor stated:

29

"The State has charged the defendant, Dontavion Wright, with two counts of premeditated first-degree murder. You've heard the judge give you instructions of lesser includeds *and I want you to understand, the State stands by its charges of the two counts of premeditated first-degree murder*." (Emphasis added.)

Again, this is not a personal opinion. Read in context, the statement merely reflects the prosecutor's assessment that the State had met its burden to prove its case for first-degree murder. The prosecutor made the statement immediately after referencing the jury instructions on lesser included offenses and just before a discussion of the evidence that the prosecutor believed established the first-degree murder charges beyond a reasonable doubt.

Later during closing argument, the prosecutor said:

"The State submits that it has proven beyond a reasonable doubt that the defendant and Nathaniel Holmes acted intentionally and with premeditation.

"You're given lesser includeds. The next one is on second-degree murder. Second-degree murder is if you feel the defendant acted intentionally, but you don't feel that the State has proven beyond a reasonable doubt that he acted with premeditation. Again, for those statements and arguments I've already made as to *why I believe it's premeditated, the State believes* that it has met that burden, but if you do not believe that it was premeditated, the State would submit to you, by the evidence presented, the number of gunshot injuries to these victims, the number of rounds sustained and fired during the course of these actions, that the defendant acted intentionally when the lives of Aaron and Dylan were taken." (Emphasis added.)

This statement is also not an improper personal opinion. It merely referenced the prosecutor's previous arguments that the evidence established premeditation beyond a

reasonable doubt and then transitioned into a discussion of the lesser included offenses that the jury should consider if it disagreed with the State on premeditation.

Finally, during the State's rebuttal closing argument, the prosecutor said:

"*There was a time not long ago where we didn't have social media, we didn't have phone downloads, we didn't have those things. You know what we had? We had physical evidence, we had eyewitness, and murderers were still found guilty*.

"You have an eyewitness here, ladies and gentlemen, you have [A.F.]. You have physical evidence here. You have the DNA evidence. You have the ballistics evidence. This firearm that was found in this house, where this defendant was staying, matched—was one of the firearms used in this case.

"The defense wants to distract you with something that may or may not exist or things that may or may not be able to happen, but what you don't have to speculate on is the physical evidence that has been presented in this case. You have that physical evidence. It's not coincidental." (Emphasis added.)

Wright asserts that within the italicized comments above, the prosecutor improperly vouched for the credibility of the evidence, offered personal opinion on his guilt, and attempted to sway the jury from its independent deliberations by suggesting that evidence that was good enough for a historical jury should be good enough to convict in this case.

Contrary to Wright's argument, the prosecutor did not improperly vouch for the evidence, express a personal opinion on his guilt, or attempt to influence the jury's independence. A review of the record shows that the prosecutor's comments were made in response to defense counsel's commentary during closing argument, which attacked

31

the reliability of A.F.'s identification of Wright and questioned the reliability of law enforcement's investigation:

- "[W]hen the officer started investigating and started running with the statement that [A.F.] gave them, there is not a single Facebook, Snapchat, Instagram—trying to think what the other one was—profile or name where Dontavion Wright is identified as Jay. It's savagehemo, it's 1savagehemo, it's noplug, and it's noplugk. Not Jay. So there's nothing, again, but [A.F.] that claims that this Jay individual somehow ties into Dontavion Wright."

- "[Law enforcement] didn't even go try to take DNA off that couch, let alone the fact they didn't look to make sure the picture that [A.F.] claimed was off her phone from that day was accurate. And they still had the phone, but never went back and looked. Never went back to verify it."

The prosecutor's comments in response to this argument were not made in error.

D.    *Conclusion*

The prosecutor did not misstate the law on premeditation, misstate the evidence to prove premeditation, or offer personal opinions on Wright's guilt. In sum, the challenged comments were all within the wide latitude afforded prosecutors in presenting the State's case. Having found no prosecutorial error, we need not reach the second step of the prosecutorial error inquiry.

IV.    *Sufficiency of the evidence*

Wright claims the evidence was insufficient to support his conviction for premeditated first-degree murder of Villarreal.

"'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

Circumstantial evidence can support a conviction of even the gravest offense if the evidence allows a factfinder to find the elements beyond a reasonable doubt. *State v. Barnes*, 320 Kan. 147, 177-78, 563 P.3d 1255 (2025); see *State v. Potts*, 304 Kan. 687, 694, 374 P.3d 639 (2016) ("[T]here is no distinction between direct and circumstantial evidence in terms of probative value."). Along with relying on circumstantial evidence to prove a crime's elements, the State may ask the jury to make reasonable presumptions and draw reasonable inferences from established facts. *State v. Chandler*, 307 Kan. 657, 670, 414 P.3d 713 (2018). An inference is sufficient to support a conviction if the evidence reasonably tends to support an inference. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016).

K.S.A. 21-5402(a)(1) defines first-degree murder as "the killing of a human being committed . . . [i]ntentionally, and with premeditation." Consistent with this statutory definition, the district court instructed the jury that to find Wright guilty of first-degree murder, the State had to prove that Wright intentionally killed Villarreal and that the killing was done with premeditation. This instruction also defined intent and premeditation. In addition, the court provided a separate instruction setting forth the principles of accomplice liability.

Premeditation is most often proved by circumstantial evidence. A factfinder may infer premeditation from the established circumstances of the case, provided that the inference is a reasonable one. But "'the circumstances in question must themselves be proved and cannot be inferred or presumed from other circumstances.'" *State v. Banks*,

306 Kan. 854, 859, 397 P.3d 1195 (2017). "Where the State relies on such inference stacking, *i.e.,* where the State asks the jury to make a presumption based upon other presumptions, it has not carried its burden to present sufficient evidence." 306 Kan. at 859.

Wright claims the State asked the jury to stack inferences to find premeditation in this case. Suggesting that his conviction for first-degree murder rested on the jury's determination that he formed premeditation while chasing Villarreal, Wright argues there was no evidence showing that he participated in the chase, so he could not have shared Holmes' premeditated intent to kill Villarreal.

Wright's argument is unavailing. As discussed in the prosecutorial error discussion above, Wright's participation in the chase may be inferred by the circumstantial evidence presented at trial. A.F. testified that after Villarreal jumped out the window, she heard footsteps and gunfire coming from the back alley. Villarreal's body was found in the alley with multiple gunshot wounds. Shell casings from two different guns, including the one linked to Wright, were found at the scene. This circumstantial evidence supported an inference that Wright participated in the chase of Villarreal and that his participation in the chase constituted evidence of premeditation. See *State v. Netherland*, 305 Kan. 167, 179, 379 P.3d 1117 (2016) (multiple pieces of circumstantial evidence supporting a single inference is not inference stacking); *Jamison*, 269 Kan. at 572 (pursuit of victim with a gun is evidence of premeditation).

Moreover, Wright wrongly presumes that the evidence of premeditation was limited to the chase. This court has identified nonexclusive factors to consider in determining whether circumstantial evidence gives rise to an inference of premeditation, which include: (1) the nature of the weapon used; (2) lack of provocation; (3) defendant's conduct before and after the killing; (4) defendant's threats and declarations before and

34

during the occurrence; and (5) dealing of lethal blows after the victim was rendered helpless. The number of factors present does not affect the analysis of what inferences can be reasonably drawn, because in some cases one factor alone may be compelling evidence of premeditation. Even so, use of a deadly weapon by itself is insufficient to establish premeditation. *State v. Killings*, 301 Kan. 214, Syl. ¶ 3, 340 P.3d 1186 (2015).

The State presented evidence of several of these factors. After Spencer and Villarreal confronted Wright about putting his arm around A.F., Wright left the house and returned with a gun and an armed accomplice. There is no evidence that Spencer and Villarreal provoked Wright with threats when they confronted him about A.F.; telling Wright to keep his distance from a 13-year-old girl is not provocation to be shot. See *Mendez*, 319 Kan. 725 (finding sufficient evidence of premeditation in part because defendant was not provoked during exchange with victims; "the exchange was not 'heated' or 'angry' and there were no threats made during the brief encounter"). Spencer and Villarreal were both shot multiple times, and Villarreal was shot as he was running away. Shell casings from Wright's gun were found at the scene. See *Cofield*, 288 Kan. at 373-74 (high number of gunshots fired is relevant factor to establish premeditation). Finally, Wright fled the scene after the killings and did not attempt to call for or render aid. See *Mendez*, 319 Kan. at 726 (fleeing scene without calling for or rendering aid supported inference of premeditation).

Viewed in the light most favorable to the State, the evidence establishing premeditation was sufficient to support Wright's conviction for first-degree murder.

V.     *Cumulative error*

Wright's final argument is that the cumulative effect of the alleged errors violated his constitutional right to a fair trial.

Cumulative trial errors, considered collectively, may require reversal of a defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Guebara*, 318 Kan. 458, 483, 544 P.3d 794 (2024).

We have found only one error based on the foreseeability provision in the aiding and abetting jury instruction and concluded the instruction was not clearly erroneous. As a result, Wright is not entitled to relief under the cumulative error doctrine. See *State v. Waldschmidt*, 318 Kan. 633, 662, 546 P.3d 716 (2024) (Unpreserved instructional errors that are not clearly erroneous may not be aggregated as cumulative error.); *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021) (The cumulative error rule does not apply if there are no errors or only a single error.).

The judgment of the district court is affirmed.

LUCKERT, J., not participating.